IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 21-CR-471 |
| | : | |
| EDWARD HOLLOWAY | : | |
| *Defendant.* | : | |

**MEMORANDUM**

**KENNEY, J.**                                                                                              **October 18, 2023**

I.   INTRODUCTION

On December 16, 2021, Defendant Edward Holloway ("Defendant") was indicted by a federal grand jury on charges of possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), and (b)(1)(C) (Count One); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Two); and possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (Count Three).

Presently before the Court is Defendant's Motion to Suppress (ECF No. 21), filed on May 17, 2023, which asks this Court to suppress a firearm and narcotics recovered from Defendant's car. The Government filed a Response in Opposition to the Motion on May 31, 2023 (ECF No. 24) to which Defendant filed a Reply on August 28, 2023 (ECF No. 33). The Court held a hearing on this motion on September 18, 2023, at which Philadelphia Police Officer John Smart ("Officer Smart") and Detective John Burke ("Detective Burke") of South Detectives testified.[1]

---

[1] Officer Danielle Foreman ("Officer Foreman") was on patrol with Officer Smart during the events at issue but did not testify at the hearing as she is currently on "injured on duty" status. ECF No. 37, Sept. 18, 2023 Hr'g. Tr. 6:20-7:4. Defendant did not testify at the hearing.

II.    **BACKGROUND**

On January 13, 2021, at approximately 6:00 p.m., Philadelphia Police Officers Smart and Foreman observed Defendant driving a blue Toyota Camry with Pennsylvania license plate number LCS-9272, near the area of 1800 Reed Street in Philadelphia. ECF No. 21, Ex. A (Philadelphia Police Department Investigation Report ("PPD Report")). The officers then carried out a routine traffic stop, albeit in a high crime area, and pulled over Defendant for violating 75 Pa.C.S. § 4524(e)(1) (driving with excessive tint on windows). *Id.*; ECF No. 37, Sept. 18, 2023 Hr'g. Tr. 6:1-3, 9:20-22.

Defendant initially sped up when officers began driving behind him, before pulling over to the side of the street. ECF No. 24 at 2. After activating their lights and sirens, the officers pulled behind Defendant's vehicle, and then approached Defendant's car. *Id.* Defendant was alone inside the car. *Id.* The Government avers that when Officer Foreman then asked Defendant to take the keys out of the ignition, Defendant began to make calls on his cell phone. PPD Report at 3. Defendant avers that, upon realizing that he would be late to his locksmith job, Defendant made several phone calls regarding the job. ECF No. 21 at 2. Officer Smart asked Defendant for his license, insurance, and registration. ECF No. 24 at 1. Defendant provided the officers with his identification and informed the officers that his insurance was located on his phone. ECF No. 37, Sept. 18, 2023 Hr'g. Tr. 11:9-10. Defendant avers that he also provided police with his registration card. ECF No. 21 at 2.

Officer Smart conducted a record check of Defendant's vehicle on a mobile data transmitter located in the officers' vehicle while Officer Foreman stood at the driver's side of Defendant's vehicle. ECF No. 37, Sept. 18, 2023 Hr'g. Tr. 11:23-12:23. This record check showed that Defendant's vehicle registration had expired in August 2020, and that the vehicle's insurance was

suspended for insurance cancellation. PPD Report. Due to the expired registration, the vehicle was eligible to be impounded by the Philadelphia Parking Authority pursuant to the Philadelphia Police Department's ("PPD") "Live Stop" Program. ECF No. 21, Ex. B (Philadelphia Police Department Directive 12.8), Appendix A. The Live Stop Program Directive states that once a tow truck arrives on location, the investigating officer shall complete an inventory search of the vehicle, including the trunk area if readily accessible. *Id.* Evidence or items recovered shall be noted on the Live Stop form. *Id.* The Directive notes that "[n]o locked areas, including the trunk area, will be forced open while conducting an inventory." *Id.* The investigating officer shall also conduct a vehicle inspection and note any damage to the vehicle, missing equipment, and personal property of value left in the vehicle. *Id.*

While Defendant sat in the vehicle, Officer Smart asked Defendant a question to the effect of whether there were any "guns, drugs, cats, sharks, or weapons" in the vehicle. ECF No. 24 at 9. Officer Smart testified that he asks such a question at vehicle stops to "read people's body language and their demeanor." ECF No. 37, Sept. 18, 2023 Hr'g. Tr. 13:25-14:1. Officer Smart further testified that after he asked this question, Defendant "was breathing heavily," "would not make eye contact," "was reaching toward the passenger's seat multiple times," "was reaching towards the center console multiple times," "looked at the center console two or three different times," and "placed his right hand resting on top of the plastic panel by the shifter column center console." *Id*. at 14:16-23. Based on Defendant's "nervous behavior and movements" alone, Officer Smart ordered Defendant to get out of the car. ECF No. 24 at 3; ECF No. 37, Sept. 18, 2023 Hr'g. Tr. 15:21-23. Officer Smart frisked Defendant for weapons and felt small circular pills in the coin pocket of his jeans; Defendant told Officer Smart that the pills were Percocet for which Defendant

3

had a prescription. ECF No. 24 at 3. Officer Smart then handcuffed Defendant, walked him to the rear of the car, and handed him to the backup officers. *Id.*

Officer Smart proceeded to investigate the inside of Defendant's car, frisking under the driver's seat and the center console shifter area. ECF No. 37, Sept. 18, 2023 Hr'g. Tr. 17:7-9. Officer Smart testified that he observed "scrape marks, scuff marks, [and] scratch marks which indicated to [him] that that paneling ha[d] been removed on multiple occasions." *Id.* at 17:16-18. When Officer Smart touched the paneling encasing the gearshift, he noticed that it was "extremely loose." *Id.* at 17:22-25. He then proceeded to pop the gear shift casing off the column with his fingertips while using a flashlight. *Id.* at 18:10-18. Officer Smart testified that when he lifted the paneling in "one straight motion" he heard "one or two" "pops or snaps." *Id.* Tr. at 26:21-25. Inside the center console shifter area, Office Smart found a black Glock, a clear sandwich baggie with large chunks of an off-white substance, smaller blue tinted baggies with a similar white substance, and an additional baggie with a brown substance. *Id.* at 18:19-19:2. The evidence was left in place. *Id.* at 19:20. When Officer Smart instructed the backup officers to place Defendant into the back of the police vehicle, Defendant attempted to flee. *Id.* at 20:1-20:7; *see also* ECF No. 24 at 4. Defendant ran for approximately three car lengths before Officer Smart caught up to Defendant after a brief struggle during which Defendant kicked Officer Smart in the leg. *Id.* at 20:9-16.

Officer Smart remained on the scene with Defendant's car until Defendant was moved from a standard patrol car to an emergency patrol wagon. *Id.* at 20:17-24. The Government avers that the officers completed a Live Stop towing report before departing for the detective division to prepare arrest paperwork. ECF No. 24 at 4. Officer Smart testified that he began completing the Live Stop towing report for the officers who ultimately stayed on the scene. ECF No. 37, Sept. 18, 2023 Hr'g. Tr. 21:17-23. Officer Smart left the scene to meet with a detective to begin processing

paperwork while the other officers remained until detectives obtained a search warrant. *Id.* at 21:2-10. Detective John Burke of South Detectives secured a search warrant which was signed by the magistrate judge at 10:22 p.m. and executed at 11:10 p.m. *Id.* at 52:23-53:6; *see* ECF No. 21, Ex. F (Application for Search Warrant and Affidavit). This search warrant lists the black Glock, narcotics, and narcotics packaging.

Additionally, Detective Burke listed the recovered evidence on property receipts: the black Glock loaded with seven live rounds in the magazine and one live round chambered (Gov't Ex. 8); the baggies containing heroin, crack cocaine, and marijuana (Gov't Ex. 9); a baggie with a red apple on the front which held additional baggies, and a razor blade (Gov't Ex. 10); and a Visa debit card (Gov't Ex. 11). These property receipts did not include all the items that were in the vehicle. *See* ECF No. 21, Ex. D (photograph of interior of vehicle, showing a soda can, cup, various papers, and a workbag, among other items).

### III.  LEGAL STANDARD

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. "Warrantless searches are presumptively unreasonable, 'subject only to a few specifically established and well-delineated exceptions.'" *United States v. Lackey*, No. 20-2977, 2022 WL 313807, at *2 (3d Cir. Feb. 2, 2022) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). "Evidence obtained through unreasonable searches and seizures must be suppressed as 'fruit of the poisonous tree.'" *United States v. Dowdell*, 70 F.4th 134, 139 (3d Cir. 2023) (internal citations omitted). "On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).

### IV.  DISCUSSION

Whether the evidence at issue was lawfully seized turns on (1) whether law enforcement's frisk of Defendant's vehicle was lawful; (2) whether law enforcement had probable cause to search Defendant's vehicle; and (3) whether the "inevitable discovery" doctrine applies.

### A. Officer Smart did not have reasonable suspicion to frisk Defendant or Defendant's vehicle

One such "specifically established and well-delineated exception" to a warrantless search is a "stop and frisk" as established by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968). An officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30. The officer must have a "minimal level of objective justification for making the stop" and "be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.* at 123-24 (internal citations and quotations omitted). It is lawful to stop an individual for violating a traffic law. *See United States v. Garner*, 961 F.3d 264, 269 (3d Cir. 2020). Here, Defendant does not dispute that he was lawfully stopped for violating 75 Pa.C.S. § 4524(e)(1) (driving with excessive tint on the car's windows). However, "each aspect of the detention must be justified by a reasonable suspicion." *United States v. Bey*, 911 F.3d 139, 145 (3d Cir. 2018).

As to a "frisk" of an individual, an officer "is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Terry*, 392 U.S. at 30. Here, the Government argues that Officer Smart had reasonable suspicion to order Defendant out of a car after a traffic stop "[o]n account of [Defendant's] nervous behavior and movements." ECF No. 24 at 3. The Government argues that reasonable suspicion arose because Defendant did not laugh in response to Officer Smart's question of whether there were any "guns, drugs, cats, sharks, or

6

weapons" in the car, and instead "immediately started breathing heavily, looked toward the shifter column, and avoided eye contact." *Id.*

The Court finds that Officer Smart did not have reasonable suspicion to frisk Defendant or Defendant's vehicle. "Nervous, evasive behavior" is just one factor considered in a "reasonable suspicion determination [which] must be based on commonsense judgments and inferences about human behavior." *Illinois,* 528 U.S. 124-25. Officer Smart testified that he regularly asks individuals the question concerning "firearms, drugs, cats, dogs, alligators, and weapons" at vehicle stops because it "helps [him] read people's body language and their demeanor." ECF No. 37, Sept. 18, 2023 Hr'g. Tr. 13:25-14:1. He further testified that he was trained by other officers to infer that an individual who does not laugh at such a question is nervous about either firearms or narcotics (*id.* at 14:4-14, 40:11-12) and that he typically receives a "laughing response" to that question (*id.* at 14:4-5). While courts "do give considerable deference to police officers' determinations of reasonable suspicion, . . . courts do not owe them blind deference." *United States v. Alvin*, 701 F. App'x 151, 156 (3d Cir. 2017) (internal quotations omitted). The Court does not find that laughing at a law enforcement officer while being questioned about drugs and weapons would be an appropriate response. Moreover, failing to laugh at a bizarre question while being questioned about drugs and weapons does not create reasonable suspicion to remove an individual from a car after a traffic violation.

In arguing that Defendant was nervous because of the gun and drugs in his vehicle, the Government attempts to eliminate all other possible reasons as to why Defendant exhibited nervousness. For example, the Government argues that Defendant was not on his way to work when he was stopped, and so he could not have been nervous about missing work. ECF No. 37, Sept. 18, 2023 Hr'g. Tr. 60:18-61:13. The Government also argues that if Defendant had a

prescription for any pills in the vehicle, "[t]he pills also aren't what's making him nervous, because if he's got a prescription, he obviously has no reason to be concerned about whether the police do or don't find them." *Id.* However, the Court notes that there are other reasonable explanations as to why Defendant may have been breathing heavily and avoiding eye contact while looking at the gear shifter when being questioned by law enforcement during a traffic stop. *See, e.g., Alvin*, 701 F. App'x at 155 ("It is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer.") (internal quotations omitted).

      The Court further finds that Officer Smart did not have the requisite reasonable suspicion to frisk the inside of Defendant's vehicle. The Supreme Court has expanded the lawful scope of a frisk to include "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden" but only when the officer "possesses a reasonable belief . . . that the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (internal quotations omitted). Here, after Officer Smart frisked Defendant, he handcuffed Defendant, walked him to the rear of the car, and transferred him to backup officers on the scene. ECF No. 24 at 3. Officer Smart could not have had a "reasonable belief" that Defendant could gain immediate control of any potential weapons located in the car while he was handcuffed at the rear of the car and flanked by other officers. The Government misleadingly argues that because "the center console area and the panel area around the gear shifter area were located within arm's length of the driver's seat and easily accessible *if the officers returned the defendant to the car*[,] a *Terry* frisk of that area was appropriate and justified." ECF No. 24 at 12 (emphasis added). Of course, the inside of a vehicle would be within arm's reach of any person who is "returned to the car." But this is not the standard. Defendant

8

could not have accessed the console from behind the vehicle, where he was handcuffed and with backup officers. The Court notes that Defendant, while handcuffed, attempted to flee and ran for approximately three car lengths before he was apprehended. ECF No. 37, Sept. 18, 2023 Hr'g. Tr. 20:6-12; ECF No. 24 at 4. However, this action does not tip the scale in favor of finding reasonable suspicion that Defendant may have gained "immediate control of weapons" in the car while handcuffed and under the supervision of multiple officers. Therefore, the officers did not have reasonable suspicion to frisk the inside of the vehicle.

### B. Officer Smart did not have probable cause to search Defendant's vehicle

Having found that law enforcement did not have reasonable suspicion to frisk the inside of Defendant's vehicle, the Court further finds that law enforcement never gained probable cause to search the inside of the car.

The Government bears the burden of establishing the applicability of the automobile exception to the Fourth Amendment which "permits vehicle searches without a warrant if there is probable cause to believe that the vehicle contains evidence of a crime." *United States v. Donahue*, 764 F.3d 293, 299–300 (3d Cir. 2014) (internal quotations and citations omitted). This exception "justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). The probable cause inquiry under the automobile exception is "commonsense," "practical," "nontechnical," "based on the totality of the circumstances," and "judged by the standard of reasonable and prudent men." *Donahue*, 764 F.3d 301 (internal quotations and citations omitted). A court must "evaluate the events which occurred leading up to the search, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Id.* (cleaned up).

Here, the Government bases its assertion of probable cause on a basis that Officer Smart first had reasonable suspicion to frisk the vehicle. The Government argues that "[t]he moment Officer Smart felt the loose panel during his frisk, his reasonable suspicion quickly ripened into probable cause to further investigate the condition of the panel that was obviously not in factory condition." ECF No. 24 at 12. However, the Court, having found that Officer Smart did not have reasonable suspicion to frisk the vehicle, further finds that the Government has not presented any facts amounting to probable cause of evidence of a crime in Defendant's vehicle. Defendant did not orally admit to any evidence of a crime in the vehicle. Nothing in the record implies that Defendant was acting under the influence of alcohol or drugs. Officer Smart testified that he "observed scrape marks, scuff marks, [and] scratch marks" which he inferred to mean that "the paneling ha[d] been removed on multiple occasions." ECF No. 37, Sept. 18, 2023 Hr'g. Tr. 17:16-18. The Court observes no such marks on or around the middle console in the photograph provided by the parties (*see* Gov't Ex. 2-D), but regardless, any such marks would not amount to probable cause.

### C. Inevitable discovery doctrine does not apply

The inevitable discovery doctrine does not apply here, as the Government has not established by a preponderance of the evidence that the evidence at issue ultimately or inevitably would have been discovered by lawful means. *See United States v. Stabile*, 633 F.3d 219, 245-46 (3d Cir. 2011); *see also United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998) ("It is the government's burden to show that the evidence at issue would have been acquired through lawful means, a burden that can be met if the government establishes that the police, following routine procedures, would inevitably have uncovered the evidence.") An analysis of the inevitable

discovery doctrine "should focus upon the historical facts capable of ready verification, and not speculation." *Id.*

### 1. The evidence would not have been found during a lawful inventory search of Defendant's vehicle

The evidence at issue would not have been found during a lawful inventory search of Defendant's vehicle. Even though it is the Government's burden to show that the evidence at issue would have been acquired through lawful means, the Government tellingly ignores Defendant's argument that the search of the console violated the PPD's inventory search policy and instead argues that the search was legal based on reasonable suspicion and probable cause.

As an initial matter, officers lawfully stopped Defendant's vehicle based on a traffic violation and then determined that Defendant's vehicle registration had expired. Under Pennsylvania law, an unregistered vehicle may be impounded pursuant to the PPD's "Live Stop" Program. ECF No. 21, Ex. B (Philadelphia Police Department Directive 12.8), Appendix A; *see also United States v. Mundy*, 621 F.3d 283, 289 (3d Cir. 2010). The PPD Live Stop Policy directs the investigating officer to inventory the contents of the impounded vehicle. The Third Circuit has cautioned that inventory searches must be conducted in a manner "to ensure that the intrusion will be limited in scope to the extent necessary to carry out the caretaking function" and to "ensure that officers performing these caretaking functions are not allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of a crime." *Mundy*, 621 F.3d at 287-88 (cleaned up). Moreover, the objective of the PPD Live Stop Policy is to "protect the owner's property and shield the officers from claims of loss or damage" and to "sufficiently regulate[] the scope of the search, directing investigating officers to search all accessible areas of the vehicle (including the trunk), provided that they are not forced open, to determine if they contain 'any . . . personal property of value' or other effects." *Id.* at 291. In

11

*Mundy*, the Third Circuit found that a search of "unlocked containers" fell within the Live Stop Policy. *Id.* There, the unlocked containers at issue consisted of a tool kit, and a plastic bag containing a shoebox which contained a brown paper lunch bag and two clear plastic zip-locked bags filled with drugs; inside the paper bag were four additional zip-locked bags with drugs. *Id.* at 286.

Here, the evidence at issue was not taken from a trunk, glove compartment, or container located in the vehicle, but from the inside of the vehicle's paneling. Defendant points to a photograph of the interior of the vehicle (ECF No. 21, Ex. C) and notes that "the officer's finger is seen forcing back the plastic of the vehicle's frame. The plastic is pulled apart from where it clicks into place. Wires are visible inside the compartment." ECF No. 21 at 5. Defendant continues that a separate photograph of the vehicle (ECF No. 21, Ex. D) "shows the area around the gear shifter—post search—that was forced open." *Id.* Defendant argues that this part of the paneling of the vehicle was "not meant to be opened" and that "[i]t is evident from this photo that it would take a significant amount of force to pry the area open." *Id*. Though Officer Smart testified that this paneling was "extremely loose" (ECF No. 37, Sept. 18, 2023 Hr'g. Tr. 17:24-25), he also testified that he heard "one or two" "pops or snaps" when handling the paneling. ECF No. 37, Sept. 18, 2023 Hr'g. Tr. 26:21-25. In other words, the evidence at issue could only have been found after disassembling part of Defendant's vehicle not intended to be disassembled—a clear violation of the Live Stop Policy's objective of "protect[ing] the owner's property."

### 2. The good faith exception does not apply

In addition, the good faith exception does not save the evidence at issue from suppression, as the warrant here was based on a "deliberately or recklessly false affidavit."

12

Under the good faith exception, "suppression of evidence is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." *United States v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001) (internal quotations omitted). "The test for whether the good faith exception applies is whether a reasonably well trained officer would have known that the search was illegal despite the magistrate [judge's] authorization." *Id.* (internal quotations omitted). "The mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." *Id.* at 307-08.

The Third Circuit has announced the following four situations in which an officer's reliance on a warrant would not be reasonable, and would therefore not trigger the exception:

> (1) when the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
>
> (2) when the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function;
>
> (3) when the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or
>
> (4) when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*Id.* at 308 (cleaned up).

The first exception applies here because the warrant was based on a "deliberately or recklessly false affidavit." The affidavit states that Defendant was removed from the car "in order to inventory the vehicle to be live stopped." ECF No. 21, Ex. F ("Application for Search Warrant and Affidavit") at 2 ¶ 3. However, Officer Smart testified that he asked Defendant to step out of the car "[t]o frisk the defendant and his immediate area for a firearm." ECF No. 37, Sept. 18, 2023 Hr'g. Tr. 15:21-16:1. The Government similarly now states that "[b]ased on the defendant's behavior and movements, Officer Smart understandably asked the defendant to step out of the

vehicle and frisked the defendant's person for any weapons." ECF No. 24 at 9. The affidavit was therefore either deliberately or recklessly false in stating that Defendant was removed from the vehicle for purposes of a live stop.

In addition, the affidavit states that the officers "noticed" that the gear shifter was loose, and then subsequently "observed" the evidence at issue, suggesting that these items were in plain view when they were not.[2] The Government similarly now argues that police may lawfully seize evidence in plain view, and that "[a]t the time Officer Smart observed the firearm and narcotics he was legally permitted to recover it at that time." ECF No. 24 at 14-15. The evidence at issue was not in plain view but rather required that Officer Smart physically lift and remove the vehicle's paneling to find the evidence; moreover, as discussed, the Court finds that Officer Smart did not have reasonable suspicion or probable cause to do this.

## V.   CONCLUSION

The Court grants Defendant's Motion to Suppress (ECF No. 21) in full. An Order will follow.

---

[2] The search warrant affidavit states the following, in part: "The male was removed from the car in order to inventory the vehicle to be live stopped. The officers noticed the gear shifter near the center of the console that the male kept reaching towards was loose. The officers observed a black Glock serial #BAFM193 (stolen status), blue tinted zip lock baggies containing an off white chunky substance alleged [to be] crack cocaine, and a clear sandwich baggie containing a brown powder substance alleged [to be] heroin. ECF No. 21, Ex. F ("Application for Search Warrant and Affidavit") at 2 ¶ 3.